Filed 1/14/19 (unmodified opinion attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| FELIPA RICHLAND EITH et al., | 2d Civil No. B272028 |
| | (Super. Ct. No. 56-2011-00403140- |
| Plaintiffs and Appellants, | CU-OR-VTA) |
| | (Ventura County) |
| v. | |
| | ORDER MODIFYING OPINION |
| JEFFREY KETELHUT et al., | [NO CHANGE IN JUDGMENT] |
| Defendants and Appellants; | |
| LOS ROBLES HILLS ESTATES HOMEOWNERS ASSOCIATION et al., | |
| Defendants and Respondents. | |

THE COURT:

It is ordered that the opinion filed herein on December 17, 2018, be modified as follows:

1. The certified portion of the opinion is expanded so that the double-brackets ("[["), reflecting portions of the opinion to be deleted from publication, are inserted at page 17 before the heading "*Plaintiffs Were Not Denied their Right to a Jury Trial*" ("[[*Plaintiffs Were Not Denied* …."). The double brackets ("[[") on page 13 are deleted.

2.  On page 4, line 2, the following sentence is inserted after the sentence ending "as a matter of law, it is not a prohibited business or commercial use":

In addition, we reject plaintiffs' claim that the judgment is void because the trial judge did not disclose contributions made by defendants' counsel to his campaign for re-election to the superior court.

3.  On page 14, on line 5 in the second full paragraph, the following is inserted after the sentence ending "had not disclosed them to plaintiffs":

Eith alleged, "Recent inspection of recorded and filed election documents (Form 460) establishes that during the pendency of the instant action Judge Walsh solicited, accepted and kept secret from Plaintiffs and plaintiffs' counsel, monetary contributions to his campaign from defense counsel [firm, partners, or staff attorneys] in the amount of $2,600.00 . . . ."  (Brackets in original.)

4.  On page 15, on line 3 in the first paragraph under the heading "B. Analysis," the following sentence is inserted after the sentence ending "disclose contributions made by defendants' counsel":

If Judge Walsh were so disqualified, the judgment would be void.

5.  At the end of the first paragraph on page 16, after the sentence ending "would be able to be impartial," the following is inserted:  (Italics added.)

There is no change in the judgment.

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| FELIPA RICHLAND EITH et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> JEFFREY KETELHUT et al., <br><br> Defendants and Appellants; <br><br> LOS ROBLES HILLS ESTATES HOMEOWNERS ASSOCIATION et al., <br><br> Defendants and Respondents. | 2d Civil No. B272028 <br> (Super. Ct. No. 56-2011-00403140-CU-OR-VTA) <br> (Ventura County) |

In *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249 (*Lamden*), our Supreme Court cautioned courts to give judicial deference to certain discretionary decisions of duly constituted homeowners association boards. The judicial deference rule does not encompass legal questions that may involve the interpretation of the covenants, conditions,

---

[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication.  The portions of this opinion to be deleted from publication are identified as those portions between double brackets, e.g., [[/]].

and restrictions (CC&Rs) of a homeowners association. Courts decide legal questions.

Here, homeowners cultivated a vineyard for the purpose of making wine to be sold to the public. The CC&Rs did not prohibit the cultivation of a vineyard for this purpose, but they did prohibit "any business or commercial activity." The operation of the vineyard may have constituted "business or commercial activity" in the literal sense of that term. But a literal interpretation in the present case would elevate form over substance and lead to absurd results. (See *SDC/Pullman Partners v. Tolo Inc.* (1997) 60 Cal.App.4th 37, 46 ["literal language of a contract does not control if it leads to absurdity"].) Because the wine was made, bottled, and sold commercially offsite, and the activity at the vineyard did not affect the residential character of the community, we conclude there was no business or commercial activity within the meaning of the CC&Rs. The homeowners association board acted within its discretion in allowing the continued operation of the vineyard, and its decision is entitled to judicial deference.

This appeal is from a judgment and a postjudgment award of attorney fees and costs in favor of Jeffrey Ketelhut and Marcella Ketelhut (the Ketelhuts) and other parties. The Ketelhuts cross-appeal from the award of attorney fees and costs. In the appeal from the judgment, the central issue is whether the Ketelhuts, homeowners in a residential common interest development, violated a restrictive covenant requiring that they not use their property for any business or commercial activity. The Ketelhuts operated a vineyard on their property. After harvesting the grapes, they sent them to a winery to be made into wine. They sold the wine over the Internet.

Other homeowners objected to the operation of what they considered to be a commercial vineyard in violation of the prohibition against any business or commercial activity. The Board of Directors (Board) of the homeowners association - Los Robles Hills Estates Homeowners Association (HOA) - decided that the vineyard was not being used for business or commercial activity.

Plaintiffs/homeowners Felipa Eith and Jeffrey Eith (the Eiths), Thomasine Mitchell and John Mitchell (the Mitchells), Stacy Wasserman, Philip Chang, Morrey Wasserman, and Eileen Gabler (hereafter collectively referred to as "plaintiffs") brought an action against the Ketelhuts, HOA, and Board members Michael Daily, Jeanne Yen, and Frank Niesner (hereafter collectively referred to as "defendants"). The court conducted a lengthy bifurcated trial on the eighth and ninth causes of action. The eighth cause of action concerned whether the operation of the vineyard was a prohibited business or commercial activity. The ninth cause of action sought to quiet title to a common area.

The trial court did not decide whether the operation of the vineyard was a prohibited business or commercial activity. Instead, it invoked the judicial deference rule of *Lamden*, *supra*, 21 Cal.4th 249. Pursuant to this rule, the trial court deferred to the Board's decision that the vineyard was not being used for business or commercial activity. The court entered judgment in favor of defendants on both the eighth and ninth causes of action. The resolution of these two causes of action rendered the remaining causes of action moot.

The trial court correctly applied the *Lamden* judicial deference rule to the Board's decision that the Ketelhuts' operation of the vineyard was not a prohibited business or

3

commercial use. We further conclude that, as a matter of law, it is not a prohibited business or commercial use. We affirm the judgment as well as the postjudgment award of attorney fees and costs.

*Factual Background*

In 1966, the Janss Corporation (Janss) developed a 28-lot residential subdivision (Los Robles Hills Estates) in the City of Thousand Oaks. The subdivision is a common interest development subject to the Davis-Sterling Common Interest Development Act. (Civ. Code, § 4000 et seq.) "Common interest developments are required to be managed by a homeowners association [citation], defined as 'a nonprofit corporation or unincorporated association created for the purpose of managing a common interest development' [citation], which homeowners are generally mandated to join [citation]." (*Villa De Las Palmas Homeowners Assn. v. Terifaj* (2004) 33 Cal.4th 73, 81.)

Janss created HOA to manage the development. It deeded to HOA an 18.56-acre parcel that the trial court and parties referred to as a "common area." The deed provides, "This conveyance is made on condition that said property shall be used solely for purposes of recreation or decoration or both, and in the event that said property is otherwise used, it shall automatically revert to grantor herein."

The development is subject to a recorded declaration of CC&Rs. Paragraph 1.01 of the CC&Rs provides, "No lot shall be used for any purpose (including any business or commercial activity) other than for the residence of one family and its domestic servants . . . ." Subparagraph 3 of paragraph 2.03 provides that "[f]or good cause shown . . . deviations from the applicable deed restrictions" may be allowed "to avoid

4

unnecessary hardships or expense, but no deviation shall be allowed to authorize a business or commercial use." Paragraph 5.07 provides, "Every person acquiring a lot . . . covenants to observe, perform and be bound by this Declaration of Restrictions."

In June 2003, the Ketelhuts purchased in the development a 1.75-acre lot on Pinecrest Drive (the Property). In 2005, they planted a vineyard consisting of 600 plants. The plants extended "just under .4 acres" into the 18.56-acre common area. In their brief, defendants acknowledge, "Unbeknownst to the Ketelhuts and [HOA], some of the grape plants encroached on the [common area]." In 2011, when HOA learned of the encroachment, its counsel wrote a letter to the Ketelhuts' counsel "demanding that [the Ketelhuts] immediately remove the vines from the common area, as well as any other items that may be located upon the Association's common area."

Before planting the grape vines, the Ketelhuts submitted a landscape plan (Exhibit 244) to the Board. It was approved by the Board's Architectural Committee (the Committee). The plan divided the Property into three separate vineyards. One would grow grapes for Cabernet Sauvignon, the second for Sangiovese, and the third for Merlot. The plan did not indicate the number of grape vines that would be planted. The Ketelhuts did not inform the Board or the Committee that the grapes grown on the Property would be used to make wine that would be offered for sale to the public.

Pranas Raulinaitis, who served on the Committee in 2005, testified that the Committee members "viewed the [vineyard] as an amazing [aesthetic] enhancement to the neighborhood." It

5

"never entered into [his] mind" that "the vineyard was being planted for commercial sale of wine to the public."

The first harvest was in 2008. At that time, Jeffrey Ketelhut "harvested the grapes . . . with the intention of bottling them for sale." He "commenc[ed the] wine business in 2009." Jeffrey Ketelhut admitted that "the sale[] of wine is a business" and that the vineyard "operates like a business." But he characterized the vineyard "as a hobby where I do it in my spare time." "[M]y purpose in getting involved wasn't to generate a profit and this become a livelihood. This was a hobby. I enjoy gardening . . . . [T]hat was therapy for me." The Ketelhuts never determined whether, excluding attorney fees, the vineyard generated a profit. Including attorney fees, it has not generated a profit in any year.

Although the Ketelhuts' tax returns were not produced, Jeffrey Ketelhut testified that he had filed Internal Revenue Service Schedule C (Form 1040) for the vineyard. Pursuant to Evidence Code sections 459 and 452, subdivision (h), we take judicial notice that Schedule C is entitled "Profit or Loss from Business (Sole Proprietor)." We also take judicial notice that, since 2009, page 1 of the instructions for Schedule C has provided, "Use [Schedule C (Form 1040)] to report income or loss from a business you operated or a profession you practiced as a sole proprietor. An activity qualifies as a business if: your primary purpose for engaging in the activity is for income or profit, and you are involved in the activity with continuity and regularity. For example, a sporadic activity or *a hobby does not qualify as a business*." (Italics added.)

In 2009, the Ketelhuts filed in Ventura County a fictitious business name statement showing that they were doing business

6

at the Property as "Los Robles Hills Winery" and "Puerta del Cielo Vineyards." They applied and obtained a "Type 17 and Type 20 license [from the Department of Alcoholic Beverage Control], which [permits] retail and wholesale [sales] over the internet only." They also obtained "a Thousand Oaks business license." The licenses showed that the business was located at the Property. But in 2012, the location of the business was changed to a Camarillo address.

The Ketelhuts began selling wine in May 2010. With one exception, they have sold only wine made from grapes grown on the Property. The exception occurred in 2011, when they made wine from sauvignon blanc grapes that they had purchased. In 2015, the Ketelhuts harvested 2,000 pounds of grapes. They invited family, friends, and neighbors to participate in the harvesting. Jeffrey Ketelhut testified, "[I]t took us an hour-and-a-half to pull down all the grapes."

After the grapes are harvested, they are transported to "Camarillo Custom Crush [in Camarillo], where all the winemaking takes place." Camarillo Custom Crush puts the wine into bottles that bear the Ketelhuts' personal label. The Ketelhuts do not store wine on the Property. They have a storage facility in Malibu. They do not ship bottles of wine from the Property.

"In a typical year," the Ketelhuts are "fortunate" to produce two barrels of wine. "[A] single barrel can hold up to 30 cases." Each case contains 12 bottles. Thus, the maximum typical annual production is 720 bottles of wine. But in 2009, the Ketelhuts "produced 132 cases," which is 1,584 bottles of wine.

At the time of trial in November 2015, the wine production was "dwindling" because they had "los[t] vines [due] to drought."

The original 600 plants had been reduced to about 400.  Jeffrey Ketelhut estimated that production for 2014 and 2015 would be 50 cases per year.  The wine for these years was still being stored in barrels.

The Ketelhuts retain ownership of the bottled wine.  They advertise on Facebook, Twitter, their personal web site, "and through [their] wholesale accounts."  The logo "Los Robles Hills Winery" and their website address are displayed on the exterior of their truck, which they park in the driveway of the Property.  "[T]hey keep the truck covered" while it is on the Property.

The Ketelhuts "sold wine to a number of restaurants and hotels in the local area."  But because of plaintiffs' lawsuit, they "let those [local sales] lapse."  At the time of trial, they were "still offer[ing] retail sales and wholesale sales," but were probably giving "at least 60 percent" of their wine to "charity."  For the last two years, their retail sales have been "zero."  Their wines appear on the menu at "a few" restaurants.

Exhibit No. 35 contains copies of pages from the Ketelhuts' web site.  The pages are dated May 22, 2014.  The wines for sale range in price from $27 to $42 per bottle.

In January 2011, the Ventura County Star published an article about the Ketelhuts' "winery."  The article said that they "were hosting wine tastings by appointment at [their] home tasting room."  In March 2011, the Department of Alcoholic Beverage Control informed the Ketelhuts that someone had complained about the wine tastings.  The Ketelhuts denied hosting wine tastings on the Property.

In its statement of decision, the trial court found:  "There was . . . no retail traffic to the premises or tasting room on the premises at [the Property].  What was accomplished [there] was

8

cultivation of the grapes, picking of the grapes, and transportation of the grapes to Camarillo."

Some homeowners complained about the vineyard. In August 2011 counsel for plaintiffs Felipa Eith and Stacy Wasserman wrote a letter to the Ketelhuts "indicating that the commercial vineyard was a violation of the CC&Rs and that [they] should stop that aspect of [their] business." The letter did not demand that the Ketelhuts stop growing grapes on the Property. It demanded that they "[c]ease operating a commercial vineyard." The letter also demanded that the Ketelhuts "[r]emove all encroaching plants, irrigation and any other vineyard materials . . . from the . . . common area."

The Board, which consisted of five homeowners, investigated the Ketelhuts' operation of the vineyard. It interviewed other homeowners. In June 2011, it conducted a meeting that was open to all of the homeowners. The Ketelhuts appeared and answered questions. After the meeting, three of the five board members - defendants Daily, Yen, and Niesner - concluded that the Ketelhuts were not using the Property for a nonresidential purpose in violation of paragraph 1.01 of the CC&Rs. They found that there was no prohibited business or commercial activity on the Property.

Board member Daily considered the vineyard to be "landscaping" rather than a business. He explained: "They were growing grape vines just like I grow fruit trees and Mr. Krupnick [a homeowner] grows avocado trees, and people grow grass in their yard. It was landscape." "[T]herefore I wasn't going to, as a board member, try to restrict them from growing grapes. Like I wouldn't restrict anybody else from growing fruit or whatever." "Their growing grapes was part of their landscape plan."

On the other hand, Daily understood that "the growing phase of their winery was part of the business." "You have to have grapes in order to make wine." Daily continued: "I believe that aspect to their business [growing grapes] is acceptable because it's their landscape." "The growing of grapes is certainly not something prohibited by the CC&R'S and if somebody takes those grapes in a very limited way without impact on the community, then I don't really care what they do with them. They can make jelly and sell it. That's fine with me." "I considered that [the Ketelhuts] were going to do something that was not going to have a negative impact on the community and therefore it was allowable."

Daily did not "know how to define the difference between business and commercial" activity. He said: "[W]hen I think of commercial activity, I think of something, you know, in a building, you know, off site. That's what I think of as commercial activity."

Board member Yen testified that "commercial activity" within the meaning of the CC&Rs "is something that would cause a stress in the community, whether it be traffic, whether it be individuals, that it's something that disrupts our quality in our community and impacts your neighbors. That's commercial activity." Yen did "not see picking grapes to go to Custom Crush [a]s impairing any activities in the community or in any way creating blockage to the community or a problem for the community."

*Procedural Background*

Plaintiffs filed a complaint consisting of nine causes of action. The trial court bifurcated the eighth and ninth causes of

10

action and tried them first. The trial began in July 2015 and ended in November 2015.

The eighth cause of action is against HOA and the Ketelhuts. It seeks declaratory and injunctive relief. It requests "a judicial determination and decree that the CC&Rs and Grant Deed prohibit" the Ketelhuts from (1) operating their "Business" and "commercial enterprise," including the vineyard, on the Property and the common area, and (2) encroaching on the common area. The eighth cause of action also requests the issuance of a permanent injunction prohibiting the Ketelhuts from operating their business on the Property and encroaching on the common area.

The ninth cause of action is against all defendants. It seeks to quiet title to the common area. It claims that each of the 28 lot owners has an undivided 1/28th ownership interest in the common area and is "entitled to the non-exclusive possession" of that area. The ninth cause of action sought a judicial declaration that HOA has "no estate, right, title or interest" in the common area.

The remaining seven causes of action are for nuisance; trespass; breach of the CC&Rs; breach of HOA's fiduciary duty; breach of fiduciary duty by Board members; and "willful, wanton misfeasance and gross negligence." In its statement of decision, the trial court said it had ordered that "[t]he remaining causes of action, for which a jury had been demanded, would be set for trial as may be necessary following determination of the Declaratory Relief and Quiet Title causes of actions."

Prior to trial on the eighth and ninth causes of action, all plaintiffs except Felipa Eith dismissed the entire action against HOA and Board members.

11

*Statement of Decision*

On the eighth cause of action for declaratory and injunctive relief, in its statement of decision, the trial court said that it was "faced with . . . whether or not to exercise its independent analysis of whether or not what the Ketelhuts were doing is a business or commercial activity, or to determine if the HOA had the discretionary authority to allow the Ketelhuts to do what they did under what is commonly known as the business judgment rule." The court applied the "deferential business judgment standard adopted by [*Lamden, supra,* 21 Cal.4th 249]."

The trial court ruled: "The Court finds here that the defendant HOA and its individual directors acted in good faith in addressing the activities of the defendants Ketelhut, and that *this decision should not be re-examined* within the context of this litigation. . . . As noted in *Beehan v. Lido Isle* (1977) 70 Cal.App.3d 858 @ 865, 'The board of directors may make incorrect decisions, as well as correct ones, so long as it is faithful to the corporation and uses its best judgment.' . . . The Court finds that this board of directors used it[s] best judgment and acted in a reasonable manner under the circumstances presented to it. As such, the Court does not grant the relief that plaintiffs seek, but finds in favor of the defendants on the cause of action for declaratory relief." (Italics added.)

On the ninth cause of action to quiet title to the common area, the trial court found that the area was deeded to HOA in 1966. "[N]o fractional interest in the property was deeded to any homeowners. Since that time, there have been no other documents, recorded or otherwise, that purport[] to grant to the homeowners the 1/28 fractional interest that they are seeking in

12

this action." Therefore, "title to the 18.5 acre common area is confirmed and quieted to [HOA]."

*Judgment*

On the eighth and ninth causes of action, the trial court entered judgment in favor of defendants. The judgment does not mention the remaining seven causes of action. In its statement of decision, the trial court said, "The rulings here made moot plaintiffs['] remaining causes of action. The case is therefore not set for further trial on those issues."

Thus, the judgment disposed of all nine causes of action and is appealable under the one final judgment rule of Code of Civil Procedure section 904.1, subdivision (a). "Judgments that leave nothing to be decided between one or more parties and their adversaries . . . have the finality required by section 904.1, subdivision (a). A judgment that disposes of *fewer* than all of the causes of action framed by the pleadings, however, is necessarily 'interlocutory' (Code Civ. Proc., § 904.1, subd. (a)), and not yet final, as to any parties between whom another cause of action remains pending." (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 741.)

[[PLAINTIFFS' APPEAL

*The Judgment Is Not Void Because of the Trial Judge's Alleged Disqualification*

A. Factual and Procedural Background

The complaint was filed on August 31, 2011. The case was assigned to Judge Henry J. Walsh.

After a contested judicial election, Judge Walsh was reelected in 2012. On February 10, 2016, the Commission on Judicial Performance admonished Judge Walsh for failing to disclose contributions made to his 2012 campaign by attorneys

13

who had appeared before him after the election.  The Commission noted, "In 2010, effective January 1, 2011, subdivision (a)(9)(C) was added to Code of Civil Procedure section 170.1 to require judges to disclose campaign contributions of $100 or more."

On the same day that Judge Walsh was admonished, he signed the judgment in the instant case.[1]  The next day, plaintiff Felipa Eith filed a request for a stay of all further action by Judge Walsh pending a hearing on a not yet filed motion to disqualify him.

On March 2, 2016, Felipa Eith filed a motion to disqualify Judge Walsh for cause pursuant to Code of Civil Procedure section 170.1.  The ground for the motion was that he had received campaign contributions from defendants' counsel and had not disclosed them to plaintiffs.  A minute order entered nine days later on March 11, 2016, states:  "Without conceding the merit of allegations of prejudice made by Ms. Eith, the court recuses itself from the case, and refers it to the supervising civil judge for re-assignment."

Plaintiffs filed a motion for a new trial.  They argued that Judge Walsh's failure to disclose the campaign contributions denied them their right to a fair trial.  Plaintiffs claimed that, if

---

[1] The Eiths "posit that the 2/10/16 handwritten date appearing adjacent [to] the signature line [on the judgment] is suspect" and "therefore unreliable."  The Eiths contend that the handwritten date "was likely backdated."  (Capitalization and bold omitted.)  We reject the contention because it is based on speculation.  There is a "presumption that judicial duty is properly performed."  (*People v. Coddington* (2000) 23 Cal.4th 529, 644, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)  The Eiths have not overcome this presumption.

Judge Walsh had made a timely disclosure, they "would certainly have sought his disqualification in 2012 to preclude the possibility that he would preside at trial."

Judge John Nho Trong Nguyen denied the motion for a new trial. He ruled, "When the facts are viewed as a whole they show that no person aware of them might reasonably entertain a doubt that Judge Walsh would be able to be impartial."

## B. Analysis

Plaintiffs argue that the judgment is void because Judge Walsh was disqualified years before the trial when he failed to disclose contributions made by defendants' counsel. In *Christie v. City of El Centro* (2006) 135 Cal.App.4th 767, 776, the court "conclude[d] that because [the trial judge] was disqualified at the time he granted the City's motion for nonsuit, that ruling was null and void and must be vacated regardless of a showing of prejudice." The court rejected the City's claim "that the grant of nonsuit need not be overturned because [the judge] was not disqualified until later" when a motion to disqualify him was granted: "[D]isqualification occurs when the facts creating disqualification arise, not when disqualification is established. [Citations.] The acts of a judge subject to disqualification are void or, according to some authorities, voidable. [Citations.] Relief is available to a party who, with due diligence, discovers the grounds for disqualification only after judgment is entered or appeal filed. [Citations.] Although a party has an obligation to act diligently, he or she is not required to launch a search to discover information that a judicial officer should have disclosed. [Citations.]" (*Id.* at pp. 776-777.)

The relevant statute is Code of Civil Procedure section 170.1, subdivision (a)(9), which provides: "A judge shall be

15

disqualified" if:  "(A) The judge has received a contribution in excess of one thousand five hundred dollars ($1500) from a party or *lawyer in the proceeding*, and either of the following applies: [¶]  (i) The contribution was received in support of the judge's last election, if the last election was within the last six years.  [¶]  (ii) The contribution was received in anticipation of an upcoming election.  [¶]  (B) Notwithstanding subparagraph (A), the judge shall be disqualified based on a contribution of a lesser amount if subparagraph (A) of paragraph (6) applies."  (Italics added.) Subparagraph (A) of paragraph (6) provides that a judge shall be disqualified if "[f]or any reason:  [¶]  (i) The judge believes his or her recusal would further the interests of justice.  [¶]  (ii) The judge believes there is a substantial doubt as to his or her capacity to be impartial.  [¶]  (iii) A person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial."

The California Supreme Court Committee on Judicial Ethics Opinions (CJEO) issued an opinion on mandatory disqualification based on a contribution of more than $1,500: CJEO Formal Opinion 2013-003 (http://www.judicialethicsopinions.ca.gov/wp-content/uploads/cjeo_ formal_opinion_2013-003.pdf).  CJEO concluded, and we agree, that the $1,500 disqualification threshhold "applies to the individual lawyer appearing in the matter." (*Id*. at p. 11.)  "[T]he Legislature did not intend the $1,500 threshold for disqualification to apply to aggregated contributions from multiple individuals from the same law firm, nor to all individuals practicing law in a contributing law firm.  A judge receiving such contributions however, is also *required* to make a determination as to whether disqualification is called for

16

under section 170.1, subdivision (a)(6)[A](iii) and [(a)](9)(B)." (*Ibid*.) "[M]andatory disqualification for individual attorney contributions over the $1,500 threshold, together with discretionary disqualification for aggregated and law firm contributions, sufficiently ensures the public trust in an impartial and honorable judiciary." (*Ibid*.)

In their opening briefs, plaintiffs list the contributions of all of the lawyers who allegedly represented defendants during the five years of litigation. No lawyer contributed more than $1,500 to Judge Walsh's campaign. Thus, the mandatory disqualification provision is inapplicable. (Code Civ. Proc., § 170.1, subd. (a)(9)(A).)

Plaintiffs have failed to show that Judge Walsh was disqualified because "[a] person aware of the facts might reasonably entertain a doubt that [he] would be able to be impartial." (Code Civ. Proc., § 170.1, subd. (a)(6)(A)(iii).) Thus, we reject plaintiffs' claim that Judge Nguyen abused his discretion in denying their motion for a new trial. (See *Garcia v. Rehrig International, Inc.* (2002) 99 Cal.App.4th 869, 874 [" ' " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears' " ' "]; *Boyle v. CertainTeed Corp.* (2006) 137 Cal.App.4th 645, 649-650 ["an appealed judgment is presumed correct, and plaintiff bears the burden of overcoming the presumption of correctness"].)

*Plaintiffs Were Not Denied Their Right to a Jury Trial*

Plaintiffs argue that the trial court's bifurcation of the eighth cause of action denied them their right to a jury trial on the legal issue of whether the Ketelhuts were using the Property

17

for a business or commercial purpose in violation of the CC&Rs. "The issue of whether [plaintiffs were] 'constitutionally entitled to a jury trial . . . is a pure question of law that we review de novo.' [Citations.]" (*Entin v. Superior Court* (2012) 208 Cal.App.4th 770, 776.)

"As a general proposition, '[T]he jury trial is a matter of right in a civil action at law, but not in equity.' [Citations.] [¶] . . . ' "If the action has to deal with ordinary common-law rights cognizable in courts of law, it is to that extent an action at law. In determining whether the action was one triable by a jury at common law, the court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case -- the *gist* of the action. A jury trial must be granted where the *gist* of the action is legal, where the action is in reality cognizable at law." ' [Citation.] On the other hand, if the action is essentially one in equity and the relief sought 'depends upon the application of equitable doctrines,' the parties are not entitled to a jury trial. [Citations.]" (*C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 8-9.)

The gist of the eighth cause of action is the request for "a permanent injunction compelling [the Ketelhuts] . . . from encroaching on the Common Area . . . and from conducting the Subject Business [a commercial vineyard] on the Subject Lot in violation of the restrictions set forth in the [CC&Rs]." Such relief is available only in equity. "A permanent injunction is an equitable remedy for certain torts or wrongful acts of a defendant where a damage remedy is inadequate." (*Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 646.)

Thus, the bifurcation of the eighth cause of action and the trial of that action by the court did not deny plaintiffs their right

18

to a jury trial.  "It is well established that, in a case involving both legal and equitable issues, the trial court may proceed to try the equitable issues first, without a jury . . . , and that if the court's determination of those issues is also dispositive of the legal issues, nothing further remains to be tried by a jury. [Citations.]"  (*Raedeke v. Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671.)

*Trial Court's Orders Relieving Original Counsel from Further Representation and Denying Request for a Continuance*

Attorney Michael T. Stoller originally represented plaintiffs Felipa Eith, Stacy Wasserman, Philip Chang, and the Mitchells. After the trial had begun, Stoller moved to be relieved as counsel of record because of  "a non-waivable conflict" of interest.  Stoller declared:  "Based on the actual conflict, there has been an irreparable breakdown of the working relationship between counsel and client."  "The specific facts which give rise to this [conflict] are . . . required to be kept confidential."  The trial court granted the motion.

The next day, plaintiffs were not ready to proceed with the trial.  Felipa Eith had unsuccessfully tried to retain substitute counsel.  The Mitchells had retained substitute counsel, but he was not ready to proceed.  Wasserman had also retained substitute counsel, but he was neither ready nor present in court. Chang was unrepresented.

The trial court denied Felipa Eith's and the Mitchells' request for a continuance.  The trial resumed with the cross-examination of Chang by counsel for the Ketelhuts and counsel for HOA.  Felipa Eith, a licensed attorney, frequently objected to counsels' questions.  After the cross-examination of Chang, Eith called John Mitchell as a witness and examined him.  On the

19

next day of trial - August 18, 2015 -  no testimony was taken. The court continued the matter to October 26, 2015.

The Eiths contend that the trial court erroneously granted Stoller's request to be relieved as counsel.  They claim that the court "failed to undertake its duty of inquiry" and "duty to explore the conflict."  The claim is forfeited because it is not supported by meaningful legal analysis with citations to the record and pertinent authority.  (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)  The only authority they cite - *Aceves v. Superior Court* (1996) 51 Cal.App.4th 584, 592-593 - is a criminal case.  There, the court noted that "case law ties the duty of inquiry to the duty of the trial court to ensure the ' "trial is conducted with solicitude for the rights of the accused" 'and to ' "protect the right of the accused to have the assistance of counsel." ' [Citation.]" (*Id.* at p. 593.)  These rights are not implicated in the instant civil action.

In any event, even if the trial court had erred, the Eiths have not shown that they were prejudiced.  (See *Freeman v. Sullivant* (2011) 192 Cal.App.4th 523, 527 ["A judgment is reversible only if any error or irregularity in the underlying proceeding was prejudicial"]; *In re S.C., supra,* 138 Cal.App.4th at p. 407 ["appellant cannot prevail without establishing that she was prejudiced by the alleged error"].)

The Eiths and other plaintiffs argue that the trial court abused its discretion in resuming Chang's cross-examination without granting their request for a continuance.  Plaintiffs have "not attempted to show [they were] prejudiced by the denial of a continuance. . . .  Therefore, [they have] not met [their] burden on appeal, and any argument that the failure to grant the requested continuance constituted reversible error is deemed

waived.  [Citation.]”  (*Freeman v. Sullivant, supra*, 192 Cal.App.4th at p. 528.)[2]]]

*The Trial Court Properly Applied the Judicial*
*Deference Rule Adopted by Our Supreme Court in Lamden*

In its statement of decision, the trial court applied the rule of judicial deference adopted by our Supreme Court in *Lamden, supra*, 21 Cal.4th 249.  The plaintiff homeowner in *Lamden* complained that a condominium development’s community association had wrongly decided to treat a termite infestation “locally (‘spot treat’).”  (*Id.* at p. 252.)  The plaintiff wanted the association to fumigate the building.  The Supreme Court stated, “[W]e adopt today for California courts a rule of judicial deference to community association board decisionmaking that applies . . . when owners in common interest developments seek to litigate ordinary maintenance decisions entrusted to the discretion of their associations' boards of directors.  [Citation.]” (*Id.* at p. 253.) The rule is as follows:  “Where a duly constituted community association board, upon reasonable investigation, in good faith and with regard for the best interests of the community association and its members, exercises discretion within the scope of its authority under relevant statutes, covenants and restrictions to select among means for discharging an obligation to maintain and repair a development's common areas, courts

_____

[2] In his reply brief, Chang argues for the first time that he was denied his “constitutionally protected due process rights to be represented by counsel while actually on the stand under cross-examination.”  The point is forfeited because it was not raised in his opening brief.  (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 & fn. 10; *Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685.)

should defer to the board's authority and presumed expertise." (*Ibid*.)

The Supreme Court explained: "The formulation we have articulated affords homeowners, community associations, courts and advocates a clear standard for judicial review of discretionary economic decisions by community association boards, mandating a degree of deference to the latter's business judgments sufficient to discourage meritless litigation . . . . [¶] Common sense suggests that judicial deference in such cases as this is appropriate, in view of the relative competence, over that of courts, possessed by owners and directors of common interest developments to make the detailed and peculiar economic decisions necessary in the maintenance of those developments. A deferential standard will, by minimizing the likelihood of unproductive litigation over their governing associations' discretionary economic decisions, foster stability, certainty and predictability in the governance and management of common interest developments." (*Lamden*, *supra*, 21 Cal.4th at pp. 270-271.)

Some courts have narrowly construed the *Lamden* rule. In *Affan v. Portofino Cove Homeowners Assn.* (2010) 189 Cal.App.4th 930, 940, the court observed: "It is important to note the narrow scope of the *Lamden* rule. It is a rule of deference to the *reasoned decisionmaking* of homeowners association boards concerning ordinary maintenance. . . . The Supreme Court's precise articulation of the rule makes clear that the rule of deference applies only when a homeowner sues an association over a maintenance decision that meets the enumerated criteria. [Citations.]" (See also *Ritter & Ritter, Inc. v. The Churchill Condominium Assn.* (2008) 166 Cal.App.4th 103, 122.)

Most courts have broadly construed the *Lamden* rule. In *Haley v. Casa Del Rey Homeowners Assn.* (2007) 153 Cal.App.4th 863, 875 (*Haley*), the court concluded that *Lamden* "reasonably stands for the proposition that the Association had discretion to select among means for remedying violations of the CC&R's without resorting to expensive and time-consuming litigation, and the courts should defer to that discretion."

In *Harvey v. The Landing Homeowners Assn.* (2008) 162 Cal.App.4th 809, 820 (*Harvey*), the CC&Rs allowed the board "to designate storage areas in the common area." They also gave the board "the exclusive right to manage, operate and control the common areas." (*Ibid.*) The court held, "Under the 'rule of judicial deference' adopted by the court in *Lamden,* we defer to the Board's authority and presumed expertise regarding its sole and exclusive right to maintain, control and manage the common areas when it granted the fourth floor homeowners the right, under certain conditions, to use up to 120 square feet of inaccessible attic space common area for rough storage." (*Id.* at p. 821.)

In *Watts v. Oak Shores Community Association* (2015) 235 Cal.App.4th 466, 473 (*Watts*), this court rejected the plaintiffs' claim "that the rule applying judicial deference to association decisions applies only to ordinary maintenance decisions." We reasoned: "It is true the facts in *Lamden* involve the association board's decision to treat termites locally rather than fumigate. But nothing in *Lamden* limits judicial deference to maintenance decisions." (*Ibid.*) "[T]here is no reason to read *Lamden* so narrowly." (*Ibid.*) "Common interest developments are best operated by the board of directors, not the courts." (*Ibid.*) We applied the judicial deference rule to the board's adoption of rules

and imposition of fees relating to short-term rentals of condominium units.  We noted that, in *Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965, 979 (*Dolan-King*), "the court gave deference to an association board's decision denying an owner's application for a room addition on aesthetic grounds." (*Watts*, *supra*, 235 Cal.App.4th at p. 473.)

Based on *Lamden*, *Haley*, *Harvey*, *Watts*, and *Dolan-King*, the judicial deference rule applies to an association board's *discretionary* decisions concerning the operation of the common interest development, e.g., the board's maintenance and repair decisions (*Lamden*), its selection of the appropriate means to remedy a violation of the CC&Rs (*Haley*), its designation of storage space in a common area (*Harvey*), its adoption of rules relating to short-term rentals (*Watts*), or its approval or rejection of a homeowner's improvement plan (*Dolan-King*).  As we observed in *Watts*, "Common interest developments are best operated by the board of directors, not the courts."  (*Watts*, *supra*, 235 Cal.App.4th at p. 473.)

Here, the Board made a decision concerning the operation of the common interest development.  The Board decided whether the Ketelhuts violated the CC&Rs' prohibition against the use of the Property for business or commercial activity.  The Board reasoned that the CC&Rs' prohibition did not encompass the operation of the vineyard because it did not affect the residential character of the community.  Board member Daily testified, "I considered that [the Ketelhuts] were going to do something that was not going to have a negative impact on the community and therefore it was allowable."  Board member Yen did "not see picking grapes to go to Custom Crush [a]s impairing any

24

activities in the community or in any way creating blockage to the community or a problem for the community."

We do not defer to the Board's interpretation of the CC&Rs. The interpretation of CC&R's is a legal question to be decided by the courts, not the Board. "CC&R's are interpreted according to the usual rules for the interpretation of contracts generally, with a view toward enforcing the reasonable intent of the parties. [Citations.]" (*Harvey*, *supra*, 162 Cal.App.4th at p. 817.) " ' "[N]ormally the meaning of contract language . . . is a legal question." [Citation.] "Where, as here, no conflicting parol evidence is introduced concerning the interpretation of the document, 'construction of the instrument is a question of law, and the appellate court will independently construe the writing.' " [Citation.]' " (*Cohen v. Five Brooks Stable* (2008) 159 Cal.App.4th 1476, 1483; see also *Legendary Investors Group No. 1, LLC v. Niemann* (2014) 224 Cal.App.4th 1407, 1413 ["contract interpretation is a legal question for the court"].)

In our review of the CC&Rs, we conclude that the Board correctly interpreted the prohibition of business or commercial activity. The prohibition does not encompass activity that has no effect on the community's residential character. The purpose of the prohibition is to preserve the community's residential character.

The trial court properly deferred to the Board's discretionary decision that the Ketelhuts' operation of the vineyard did not violate the prohibition against business or commercial activity because it did not affect the community's residential character. The Board made its decision "upon reasonable investigation, in good faith and with regard for the best interests of the community association and its members."

25

(*Lamden*, *supra*, 21 Cal.4th at p. 253.).  The Board interviewed homeowners and conducted a public hearing at which the Ketelhuts answered questions.  Yen testified that the Board's decision was "based on our looking at it from the scope of the community:  Is it creating any stress for the community, is it impairing the community's functioning, is it invasive to the community, and have we received any complaints regarding what is happening."  "Our decision and focus of discussion was on the impact o[n] the community."

"Common sense suggests that judicial deference in such cases as this is appropriate, in view of the relative competence, over that of courts, possessed by owners and directors of common interest developments . . . ."  (*Lamden*, *supra*, 21 Cal.4th at p. 270.)  The Board members lived in the community and had discussed the Ketelhuts' vineyard with other homeowners.  They were in a much better position than the courts to evaluate the vineyard's effect on the community.  We "should defer to the [B]oard's authority and presumed expertise."  (*Id*. at p. 265.)

*The Board Correctly Decided that the Operation of the*
*Vineyard Is Not Prohibited Business or Commercial Activity*

As an alternative holding, we conclude that as a matter of law, the Ketelhuts' operation of the vineyard is not prohibited business or commercial activity because it does not affect the community's residential character.

No signs advertising wine sales are posted on the Property.  Although the Ketelhuts' logo "Los Robles Hills Winery" and their website address are displayed on the exterior of their truck, "they keep the truck covered" while it is on the Property.  The wine is made and bottled in Camarillo.  The bottled wine is stored in Malibu.  It is not shipped from the Property.  The trial court

26

found that there is "no retail traffic" to the Property, which does not have a wine-tasting room.  The court said, "What was accomplished [on the Property] was cultivation of the grapes, picking of the grapes, and transportation of the grapes to Camarillo."

Had the Ketelhuts retained the wine for their personal use or given it away to friends or charity, there would have been no basis for finding business or commercial activity.  All activities relating to the vineyard would have been permissible.  That the Ketelhuts offered the wine for sale over the Internet did not transform their use of the Property into prohibited business or commercial activity.  At all times the operation of the vineyard was fully consistent with residential use.  No homeowner familiar with the vineyard's operation would have had reason to suspect that the vineyard was being used to produce wine for sale to the public.  The business or commercial activity of making and selling the wine did not occur on the Property.  Board member Daily testified, "They were growing grape vines just like I grow fruit trees and Mr. Krupnick grows avocado trees, and people grow grass in their yard."  Moreover, instead of being a blight on the community, the vineyard was an aesthetic enhancement.  Pranas Raulinaitis, who served on the Committee that approved the Ketelhut's landscape plan in 2005, testified that the Committee members "viewed the [vineyard] as an amazing [aesthetic] enhancement to the neighborhood."

We recognize that the growing of grapes on the Property is an integral part of the Ketelhuts' winemaking business.  As Daily testified, "You have to have grapes in order to make wine."  But absurd consequences would flow from construing the CC&Rs as prohibiting any business or commercial activity whatsoever

irrespective of its effect on the residential character of the community.

For example, some appellate attorneys work at home, reading records, doing research, and writing briefs, but meet with clients elsewhere. Although these attorneys are engaged in the business of practicing appellate law at their home offices, their business activities do not affect the residential character of their communities.

It would be absurd to construe the CC&Rs as prohibiting such harmless conduct, just as it would be absurd to construe them as prohibiting the Ketelhuts from operating their vineyard. " 'In construing a contract the court . . . should adopt that construction which will make the contract reasonable, fair and just [citation]; . . . [and] should avoid an interpretation which will make the contract . . . harsh, unjust or inequitable [citations], or which would result in an absurdity [citations] . . . .' " (*Wright v. Coberly-West Co.* (1967) 250 Cal.App.2d 31, 35-36.)

There will be instances, of course, where a homeowner's activity constitutes prohibited business activity even though the business is primarily conducted off the residential premises. For example, if a homeowner conducted a trucking business off the premises except that the trucks were stored on the premises when not in use, the homeowner might be in violation of the business prohibition. The presence of the commercial trucks would detract from the community's residential character. (See *Smart v. Carpenter* (N.M. Ct.App. 2006) 134 P.3d 811.)

[[*The Ninth Cause of Action to Quiet Title*

The Eiths argue that the trial court's judgment is not supported by the law or the facts. It is not clear whether this argument applies solely to the eighth cause of action for

28

declaratory and injunctive relief, or whether it also applies to the ninth cause of action to quiet title to the common area. If the argument applies to the ninth cause of action, it is forfeited because it is not supported by meaningful legal analysis with citations to the record and pertinent authority. (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

The Eiths contend that, on the ninth cause of action, "the trial court did not articulate in its decision (a) what if any legal or equitable rights each of the lot owners had in the 18 acres, nor did the court decide (b) whether or not the 18 acres is 'common area' as argued by [plaintiffs]." We disagree. In its statement of decision the trial court declared: "The common area of 18.56 acres is Common Interest land as defined by CCR Title 10, Chapter 6, Article 1, paragraph 2705." "[T]itle to the 18.5 acre common area is confirmed and quieted to the defendant Homeowners Association." The court rejected the complaint's contention that the common area is "owned collectively by the twenty-eight (28) lot owners of the subdivision, each lot owner owning a 1/28 undivided interest in said property."

*Street Maintenance*

The Eiths assert that "the trial court [err]ed in refusing to decide street maintenance obligations in the [common interest development]." In its statement of decision the trial court said it had "ruled before the presentation of evidence that the issue of the streets was not tendered by the pleadings or discovery and therefore would not be a subject for resolution at trial." The Eiths have forfeited the issue because they have not presented meaningful legal analysis with supporting citations to the record and pertinent authority. (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

29

*The Kettlehuts' Encroachment on the Common Area*

The Eiths claim that the trial court erred in "refusing to decide if the Ketelhut vineyard encroached on . . . common area." The court decided this issue. In its statement of decision the court found, "[S]tarting in January of 2005, [Jeffrey Ketelhut] planted 600 grape vines on his property and extending into the 18.5 acre common area at the rear of []his property by just under .4 acres." In any event, it is undisputed that the Ketelhuts encroached on the common area. In their brief defendants acknowledge, "Unbeknownst to the Ketelhuts and [HOA], some of the [Ketelhuts'] grape plants encroached on the 18-acre parcel owned by the Association."

*Denial of Plaintiffs' Motion to Disqualify HOA's Counsel*

The Eiths maintain that the trial court erroneously denied plaintiffs' motion to disqualify HOA's counsel. The issue is forfeited because the Eiths have failed to present meaningful legal analysis with supporting citations to the record and authority. (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

*Plaintiffs' Appeal from Award of Attorney Fees*

"In an action to enforce the governing documents [of a common interest development], the prevailing party shall be awarded reasonable attorney's fees and costs." (Civ. Code, § 5975, subd. (c).) Except for the Eiths, plaintiffs' appeal from the award of attorney fees is based on their claim that the judgment in favor of defendants on the eighth cause of action must be reversed. Therefore, they assert that the award of attorney fees is "premature." Because we are affirming the judgment, the award is not premature.

The Eiths present numerous grounds for reversing the award of attorney fees. They contend that defendants are not

"true prevailing parties." (Capitalization omitted.) The contention lacks merit because judgment was rendered in favor of defendants and against plaintiffs on both the eighth and ninth causes of action.

The Eiths argue that, because of Jeffrey Eith's "bankruptcy filing" and the automatic stay triggered by that filing, it was "improper" to order him to pay attorney fees. "The automatic stay is self-executing, effective upon the filing of the bankruptcy petition. [Citations.] The automatic stay sweeps broadly, enjoining the commencement or continuation of any judicial . . . proceedings against the debtor . . . ." (*In re Gruntz* (9th Cir. 2000) 202 F.3d 1074, 1081.) The automatic stay argument is forfeited because it was not raised in the trial court. (*In re Marriage of Moschetta* (1994) 25 Cal.App.4th 1218, 1227 ["parties are not normally allowed to raise new issues on appeal [because] it is unfair to their opponents who did not have the opportunity to attack that theory factually or legally in the trial court"].)[3]

The Eiths remaining grounds for contesting the award of attorney fees are rejected for lack of meaningful legal analysis with supporting citations to the record and pertinent authority. (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

THE KETELHUTS' CROSS-APPEAL FROM
ORDER AWARDING ATTORNEY FEES

The Ketelhuts claim that they were entitled to attorney fees of $351,432.55. In their cross-appeal, the Ketelhuts argue that the trial court abused its discretion in reducing the fees to $250,506.50, a shortfall of $100,926.05.

---

[3]Defendants raised the forfeiture issue in their respondent's brief. The Eiths did not file a reply brief.

31

*Disallowance of Fees Paid to Prior Attorney*

The $100,926.05 shortfall includes attorney fees of $75,930.05 paid by the Ketelhuts to their prior attorney, Myers, Widders, Gibson, Jones & Schneider, LLP (Myers, Widders).  The fees are supported by Jeffrey Ketelhut's declaration under penalty of perjury and Myers, Widders' detailed billing statements (Exhibit B to the declaration).  Each statement includes a description of the service performed, the date it was performed, the time expended, and the fee incurred for the service.  There is no supporting declaration from Myers, Widders.

As to Jeffrey Ketelhut's declaration, plaintiffs objected to the following statement:  "My former attorneys of record submitted invoices to me for attorney fees incurred in the defense of myself and Marcella Ketelhut in the amount of $75,930.05.  A true and correct copy of the original attorney bills is attached hereto as Exhibit 'B.' "  The ground for plaintiffs' objection was that "Mr Ketelhut has no personal knowledge of the contents, authenticity, or originality of the billings he has attached as Exhibit B."

As to the billing statements (Exhibit B), plaintiffs objected: "The contents of Exhibit B are unauthenticated hearsay, and lack any foundation for admissibility under any exception to the hearsay rule.  Mr. Ketelhut . . . further [is] not a qualified witness with personal knowledge adequate to testify to the genuineness or authenticity or accuracy of any of the contents of Exhibit B, which are documents prepared by other persons and/or entities."

The trial court sustained plaintiffs' objections.  It disallowed the fees in their entirety because they are "not properly established."  The court provided no further explanation for its ruling.

32

" ' " '[A]n appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion.' " [Citation.]' [Citation.] 'The court's " 'discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered.' " [Citation.]' [Citation.]" (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 199.) We also review for abuse of discretion a trial court's decision to award or deny attorney fees. (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.)

The Ketelhuts contend that the billing statements were admissible pursuant to the following rule of *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 42-43 (*Pacific Gas*): "Since invoices, bills, and receipts for [attorney fees] are hearsay, they are inadmissible independently to prove that liability for the [fees] was incurred, that payment was made, or that the charges were reasonable. [Citations.] If, however, a party testifies that he incurred or discharged a liability for [attorney fees], any of these documents may be admitted for the limited purpose of corroborating his testimony [citations], and if the charges were paid, the testimony and documents are evidence that the charges were reasonable. [Citations.]"

Because "there was testimony in the present case that the invoices had been paid," the billing statements in Exhibit B were admissible to corroborate Jeffrey Ketelhut's declaration that he had incurred liability for the attorney fees. (*Pacific Gas*, *supra*, 69 Cal.2d at p. 43.) They were also admissible to show that the fees were reasonable. (*Ibid*.)

But "[t]he individual items on the invoices . . . were [to be] read, not [only] to corroborate payment or the reasonableness of

33

the charges, but to prove that [the claimed services] had actually been [performed]. No qualified witness was called to testify that the invoices accurately recorded the [services performed] by [Myers, Widders], and there was no other evidence as to what [services] were [performed]. This use of the invoices was [impermissible]. [Citations.] An invoice submitted by a third party is not admissible evidence on this issue [i.e., to prove that the services described in the invoice were actually performed] unless it can be admitted under some recognized exception to the hearsay rule." (*Pacific Gas*, *supra*, 69 Cal.2d at p. 43.) "It might come in under the business records exception (Evid. Code, § 1271) if '. . . supported by the testimony of a witness qualified to testify as to its identity and the mode of its preparation.' [Citation.]" (*Id*. at p. 43, fn. 10.)

In *Pacific Gas* the defendant damaged the plaintiff's turbine. Plaintiff brought an action against defendant to recover its cost of repair. "To prove the amount of damages sustained, plaintiff presented invoices received from . . . [the] repairer of the turbine, the drafts by which plaintiff had remitted payment, and testimony that payment had been made." (*Pacific Gas*, *supra*, 69 Cal.2d at p. 42.) Although the invoices were admissible to show the reasonableness of the charges for the repairs, they were not admissible "to prove that these specific repairs had actually been made." (*Id*. at p. 43.)

Here, as in *Pacific Gas*, the billing statements from Myers, Widders were not admissible to show that the services described in the statements had actually been performed. No qualified witness testified as to the "identity and . . . mode of . . . preparation" of the statements. (Evid. Code, § 1271, subd. (c).) Accordingly, the trial court did not abuse its discretion in

34

sustaining plaintiffs' objections and concluding that the Ketelhuts' claim for attorney fees billed by Myers, Widders had not been "properly established."

*McAllister v. George* (1977) 73 Cal.App.3d 258, is distinguishable. There, the defendant argued that a bill for dental services had been properly excluded from evidence because it was hearsay. The appellate court rejected the defendant's argument: "Plaintiff testified that the dental services *were performed*, that he received a bill for them, and that he paid the bill. It has been held that under such circumstances the bill, which ordinarily would constitute inadmissible hearsay, is nevertheless admissible for the limited purpose of corroborating plaintiff's testimony and showing that the charges were reasonable. [Citations.]" (*Id.* at p. 263, italics added.) Here, in contrast, Jeffrey Ketelhut did not declare, and lacked the personal knowledge necessary to declare, that the numerous services described in the billing statements had actually been performed. For example, a statement dated August 31, 2011, billed the Ketelhuts for attorney conferences in which they had not participated. The Ketelhuts lacked personal knowledge whether these conferences had occurred. In his declaration Jeffrey Ketelhut said that Myers, Widders had "submitted invoices to [him] for attorneys fees incurred in the defense of [himself] and Marcella Ketelhut." He did not say that Myers, Widders had actually performed the services described in the invoices. The Ketelhuts could have rectified the situation by submitting a supporting declaration from Myers, Widders.[4]

---

[4]See California Attorney Fee Awards (Cont.Ed.Bar 3d ed., 2018 update) Contents of Comprehensive Fee Motion, § 11.53 ["A comprehensive fee motion should include the following: . . .

*Disallowance of Attorney Fees for 2014*
*Motion (Morrey Wasserman and Eileen Gabler)*

In March 2014, plaintiffs Morrey Wasserman and Eileen Gabler voluntarily dismissed themselves as parties to the action against the Ketelhuts. The Ketelhuts moved for an award of attorney fees against Wasserman and Gabler. In June 2014, the trial court granted the motion and awarded attorney fees of $156,614.47. Wasserman and Gabler appealed. In an unpublished opinion, we concluded that the award was premature. We reversed and "remanded with directions to defer ruling on [the Ketelhuts'] motion for attorney fees until after the litigation among the various parties has been resolved." (*Wasserman et al. v. Ketelhut et al.* (Dec. 1, 2015, B258642) [nonpub. opn.].)

After judgment was rendered in favor of the Ketelhuts as to all of the parties, the Ketelhuts sought an award of attorney fees incurred in bringing their unsuccessful 2014 motion to recover attorney fees from Wasserman and Gabler. The trial court denied the request, characterizing the 2014 motion as a "failed motion[]." The Ketelhuts claim that the trial court abused its discretion because they were the prevailing party. We disagree. The Ketelhuts were not the prevailing party as to the 2014

---

Declarations from the attorneys claiming fees, stating their background and training, their role in the litigation, a description of their services (often with time records attached as an exhibit to the declaration), an explanation of why the hours are reasonable (*e.g.,* hours generated by the losing party's tactics), a description of any billing judgment exercised, a statement of the hourly rates and their basis, and any other facts the court needs for its determination."

motion because the order granting the motion was reversed on appeal.

*Disallowance of Attorney Fees for 2013 Motion (Kelly Park)*

Kelly Park was one of the original plaintiffs in the action against the Ketelhuts.  In August 2013 she voluntarily dismissed herself as a party to the action against the Ketelhuts.  In November 2013 the trial court denied the Ketelhuts' motion for an award of attorney fees against Park.

The Ketelhuts assert:  "[They] are not appealing the trial court's 2013 denial of their attorneys fee motion against Kelly Park.  [They] are appealing the July 28, 2016 Order reducing [their] fee award by amounts incurred in preparing that 2013 motion."  The trial court said that it had reduced the Ketelhuts' attorney fees for "the time spent on the failed motion[] for attorney's fees against Kelly Park."  The trial court did not abuse its discretion because the Ketelhuts were not the prevailing party on the 2013 motion.]]

*Disposition*

The judgment and postjudgment award of attorney fees and costs are affirmed.  The parties shall bear their own costs on appeal.

<u>CERTIFIED FOR PARTIAL PUBLICATION.</u>

GILBERT, P. J.

I concur:

PERREN, J.

37

PERREN, J.

I concur.

In a vain effort to "define what may be indefinable," Justice Potter Stewart opined, "I know it when I see it."[5] In like manner, the dissent "knows unfairness when [it] sees it" - when it sees how the Ketelhuts harvest their grapes and make and sell their wine. The majority sees it otherwise. In my opinion this is not a matter for such subjectivity. Rather, we should defer to the good faith exercise of discretion and "the board's authority and presumed expertise." (Maj. opn. *ante*, at pp. 22-23, citing *Lamden v. La Jolla Shores Clubdominum Homeowners Assn.* (1999) 21 Cal.4th 249, 265.)

Both the majority and the dissent appeal to "Common sense." (Maj. opn. *ante*, at p. 22; dis. opn. *post*, at p. 3.) In doing so they quote from *Lamden*: I join with them and set forth the full closing of that opinion:

*"Common sense suggests that judicial deference in such cases as this is appropriate, in view of the relative competence, over that of courts, possessed by owners and directors of common interest developments to make the detailed and peculiar economic decisions necessary in the maintenance of those developments. A deferential standard will, by minimizing the likelihood of unproductive litigation over their governing associations' discretionary economic decisions, foster stability, certainty and predictability in the governance and management of common interest developments. Beneficial corollaries include enhancement of the incentives for essential voluntary owner participation in common interest development governance and conservation of scarce judicial resources." (Lamden v. La Jolla Shores*

---

[5] *Jacobellis v. Ohio*, (1964) 378 U.S. 184, 197.

1

*Clubdominum Homeowners Assn., supra*, 21 Cal.4th at pp. 270-271, italics added.)

This dispute and the resulting expense and acrimony are strong testament to the wisdom of such deference.

<u>CERTIFIED FOR PUBLICATION.</u>

PERREN, J.

2

YEGAN, J., Dissenting:

I know unfairness when I see it. The judgment should be reversed because plaintiffs are entitled to a ruling from the trial court that the Ketelhuts were conducting a business in violation of the Covenants, Conditions, and Restrictions running with the land. (CC&Rs.) It does not matter whether the Ketelhuts could win an award for having the most beautiful vineyard in the world. It does not matter whether the wine from the grapes rivals the finest wines of the Napa Viticulture. As I shall explain, the facts unerringly point to the conclusion that the Ketelhuts were conducting a vineyard business on their property (the Property).

There will, of course, be situations in which the conducting of a business at a residence in violation of the CC&Rs will be so trivial to the neighborhood that it will be deemed not to be in violation of the CC&Rs. There is no reason to list them and one is only limited by imagination. As Colonel Stonehill said, "I do not entertain hypotheticals. The world, as it is, is vexing enough." (True Grit (2010 film).) So here, we need only decide whether the maintenance of the vineyard as a business is in violation of the CC&Rs.

*Judicial Deference Rule*

The judicial deference rule applies where an association board "exercises discretion within the scope of its authority under relevant statutes, covenants and restrictions to select among means for discharging an obligation to maintain and repair a development's common areas." (*Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 265 (*Lamden*).) In *Lamden* our Supreme Court concluded that the courts should defer to the board's treatment of a termite problem

1

because it was "a matter entrusted to [the board's] discretion under the [CC&Rs] and [now repealed] Civil Code section 1364." (*Id.* at pp. 264-265.) Here, there is no statute or provision in the CC&Rs entrusting to the discretion of the Los Robles Hills Estates Board of Directors (Board) whether a homeowner is engaging in prohibited business or commercial activity within the meaning of the CC&Rs. This is a straightforward legal question to be decided by the courts, not members of the Board who lack legal expertise. (See *Smart v. Carpenter* (N.M.Ct.App. 2006) 134 P.3d 811, 814 [it "is a question of law" whether homeowner violated covenant prohibiting "'commercial activity or business' on any tract in the Subdivision"].)

The inapplicability of the judicial deference rule is supported by *Dover Village Assn. v. Jennison* (2010) 191 Cal.App.4th 123 (*Dover Village*). There, the issue was whether a sewer pipe was ordinary "common area to be maintained and repaired by the Association" or "'[an] exclusive use common area'" designed to serve a particular homeowner who would be responsible for its maintenance. (*Id.* at pp. 126-127.) The Association decided that the sewer pipe was the defendant homeowner's responsibility because it exclusively serviced his condominium. The appellate court concluded that the sewer pipe was not an exclusive use common area. It rejected the Association's argument that, under *Lamden*, it should defer to the Association's decision: "The argument fails because it confuses a legal issue governed by statutory and contract text with matters that genuinely do lend themselves to board discretion. [¶] [¶] There is an obvious difference between a legal issue over who precisely has the responsibility for a sewer line [or whether a homeowner is engaged in prohibited business or

2

commercial activity within the meaning of the CC&Rs] and how a board should go about making a repair that is clearly within its responsibility. . . .  [W]e know of no provision in the Davis-St[e]rling Act or the CC&R's that makes the Association or its board the ultimate judge of legal issues affecting the development." (*Id.* at p. 130)

The court considered *Lamden* to be "a nice illustration of matters genuinely within a board's discretion." (*Dover Village*, *supra*, 191 Cal.App.4th at p. 130.)  Unlike *Lamden*, the legal issue here is not genuinely within the Board's discretion.  In *Lamden* the Supreme Court noted, "Common sense suggests that judicial deference in such cases as this is appropriate, in view of the relative competence, over that of courts, possessed by owners and directors of common interest developments to make the detailed and peculiar economic decisions necessary in the maintenance of those developments." (*Lamden*, *supra*, 21 Cal.4th at pp. 270-271.)  In contrast to *Lamden*, the Board is not equipped to determine whether the Ketelhuts were engaged in business or commercial activity in violation of the CC&Rs.

If the judicial deference rule applied here, there would be few board decisions to which it did not apply.  The judicial deference rule "does not create a blanket immunity for all the decisions and actions of a homeowners association." (*Affan v. Portofino Cove Homeowners Assn.* (2010) 189 Cal.App.4th 930, 940.)

### *The Vineyard Is Business or Commercial Activity*
### *within the Meaning of the CC&Rs*

The majority opinion concludes that, as a matter of law, the Ketelhuts' operation of the vineyard is not a prohibited business or commercial activity because it does not affect the residential

3

character of the community.  But paragraph 1.01 of the CC&Rs does not say, "No lot shall be used for any purpose (including any business or commercial activity [*that does not affect the residential character of the community*]) other than for the residence of one family and its domestic servants."  (Italicized language added.)  ""In construing a contract which purports on its face to be a complete expression of the entire agreement, courts will not add thereto another term, about which the agreement is silent.  [Citation.]"' [Citation.]"  (*The Ratcliff Architects v. Vanir Construction Management, Inc.* (2001) 88 Cal.App.4th 595, 602.)  On its face paragraph 1.01 prohibits *any* business or commercial activity without qualification or exception.  Subparagraph 3 of paragraph 2.03 of the CC&Rs provides that "[f]or good cause shown . . . deviations from the applicable deed restrictions" may be allowed "to avoid unnecessary hardships or expense, *but no deviation shall be allowed to authorize a business or commercial use.*"  (Italics added.)  How can the operation of a commercial vineyard not qualify as commercial use?

There may be cases where business or commercial activity is so de minimis or concealed that it does not violate the CC&Rs, such as the example given in the majority opinion of an appellate attorney with a home office who sees no clients on the premises.  But the Ketelhuts' operation of their commercial vineyard was neither de minimis nor concealed.  They filed a fictitious business name statement and were issued both a business license and an alcoholic beverage sales license.  The licenses originally indicated that the business was located at the Property.  Board member Yen testified:  "[A] notice of intent to sell [alcoholic beverages] . . . was posted on their front where their mailbox was, and it needed

4

to be posted elsewhere because you're not supposed to be advertising a business in the community. So they were advised not to post it there." The Ketelhuts advertised on Facebook, Twitter, their personal web site, "and through [their] wholesale accounts." They filed an Internal Revenue Service Schedule C (Form 1040) to report their business income or loss. The logo "Los Robles Hills Winery" and their website address were displayed on the exterior of their truck. Although the Ketelhuts covered the truck while it was parked on the Property, the logo and website address were openly displayed when they drove the truck to and from the Property.

The Ketelhuts sought and obtained publicity for their winery by giving an interview to the local newspaper, the Ventura County Star. In January 2011 the newspaper published an article about the winery. Until he read the article, plaintiff John Mitchell was not aware that the Ketelhuts were growing grapes for a commercial purpose. Mitchell "knew that they weren't supposed to be doing an activity like that because of the CC&Rs," which "exclude any business activity."

A copy of the newspaper article was marked as Exhibit 54, but it was neither offered nor received into evidence. I quote from the article because it was before the trial court, witnesses testified as to its content, Felipa Eith quoted from the article during her examination of Jeffrey Ketelhut, and the article arguably is judicially noticeable not to prove the truth of the facts reported, but to prove the extent to which the commercial nature of the vineyard was publicized. (Evid. Code, §§ 452, subd. (h), 459.)

The article takes up the entire front page of the newspaper's Sunday "Business" section ("Section E"). It is

5

entitled, "GRAPE expectations[:]  T.O. [Thousand Oaks] couple's home vineyard about to pay off."  The article includes photographs of the vineyard, the Ketelhuts, and bottles of wine produced from grapes grown at the vineyard.  The bottles are labeled, "Los Robles Hills."  One of the photographs of the Ketelhuts is captioned, "Jeff and Marcella Ketelhut, owners of the *commercial* vineyard in the Conejo Valley, enjoy discussing the challenges of wine production."  (Italics added.)  The article includes the website address of the Ketelhuts' winery.

The article states in part:  "For Jeff and Marcella Ketelhut, the dream of owning a winery has come to fruition on the slopes near their Thousand Oaks home."  "The Ketelhuts are not yet making a profit but said they are selling their wine, at $35 a bottle, through their website, by word of mouth and by hosting wine tastings by appointment at their home tasting room. [¶] . . . The couple also has planted a selection of olive trees on the property and hopes to begin producing cured olives and olive oil for sale in the near future.  [¶]  They said they are exploring ways to expand their commercial enterprise, given the potential they believe exists in the Conejo Valley.  [¶]  'We wanted to try it for a few years, and initially it was more of a fun thing, but now we're barely doing any marketing and the stuff is flying off the shelves,' said Marcella."  The article observes that "the Ketelhuts' Los Robles Hills Winery [is] on the list of 15 [wineries] that make up the Ventura County Wine Trail."  Jeffrey Ketelhut testified that in 2010 the Ketelhuts had become "members of the Ventura County Wine Trail."

Through the newspaper article, the Ketelhuts proclaimed to Ventura County residents that they were operating a commercial vineyard on the Property.  It is understandable that

6

homeowners, such as John Mitchell, would be alarmed by this development, which appeared to be a blatant violation of the CC&Rs' prohibition against "any business or commercial activity." Homeowners could view the article as a public flaunting by the Ketelhuts of their violation.

The majority opinion states, "No homeowner familiar with the vineyard's operation would have had reason to suspect that the vineyard was being used to produce wine for sale to the public." (Maj. opn., *ante* at p. 27.) But the newspaper article put the entire community on notice that the Ketelhuts were operating a commercial vineyard.

Moreover, the vineyard was in plain view of the homeowners. Richard Monson testified that, "[w]hen [he] drove past the Ketelhuts' home," he "noticed the grapevines on the hillside." Because the grapevines were visible to everyone, they would be a continual source of aggravation to homeowners who objected to a commercial agricultural operation in their community. The majority opinion says that the vineyard was an "aesthetic enhancement." (Maj. opn., *ante* at p. 27.) But to the homeowners who objected to its presence, it was an eyesore.

The Ketelhuts' commercial vineyard was not permissible because, as Board member Daily testified, "Their growing grapes was part of their landscape plan." The landscape plan, which was approved in 2005 by the Board's Architectural Committee (the Committee), did not indicate that the vineyard would be used to grow grapes to make wine that would be offered for sale to the public. In 2005 the Ketelhuts did not inform the Committee of this future commercial use. Had it been so informed, the Committee probably would not have approved the landscape plan.

Difficulties may arise in applying the majority opinion's standard of whether business or commercial activity affects the residential character of the community. With such a vague standard, where does one draw the line between activity that affects and activity that does not affect residential character? This is a purely subjective determination.

*A New Meaning for CC&Rs*

Traditionally, CC&Rs are restrictions and limitations on land use. Now at the whim of the Board, CC&Rs mean "choices, creativity, and recommendations." A homeowner has a choice and may be creative in the use of property. The traditional CC&Rs have been transformed into recommendations that the Board may elect not to enforce. Rather than having the force of law, the CC&Rs have the backbone of a chocolate éclair. And, of course, the Board's composition may change and there will be inconsistency in just how much business or commercial activity will be allowed.

CC&Rs play a vital role in protecting the reasonable expectations of parties when they purchase land. This concept is lost in the majority opinion. Future buyers in the development should be expressly advised that business or commercial activity is allowed at the discretion of the Board. This may actually devalue the land.

Finally, to monetarily punish plaintiffs with attorneys' fees is not only unfair, it is unconscionable. The Ketelhuts were the "first movers." They created the entire problem by operating a commercial vineyard and publicizing it in the local newspaper.

They are at fault and they should pay for it.

<u>CERTIFIED FOR PUBLICATION.</u>


YEGAN, J.

9

Henry J. Walsh, John Nguyen, Judges

Superior Court County of Ventura

_____

Richland & Associates, Felipa R. Richland, in propria persona, for Plaintiffs and Appellants Felipa Richland Eith and Jeffrey Eith.

The Aftergood Law Firm, Aaron D. Aftergood for Plaintiffs and Appellants Thomasine Mitchell, John Mitchell, Philip Chang and Eileen Gabler; Freeman Freeman & Smiley, Steven E. Young for Plaintiffs and Appellants Stacy Wasserman and Morrey Wasserman.

Yoka & Smith, Christopher E. Faenza, Christine C. De Metruis for Defendants and Appellants Jeffrey Ketelhut and Marcella Ketelhut; Slaughter, Reagan & Cole, Barry J. Reagan, Gabriele M. Lashly, Michael Lebow for Defendants and Respondents Los Robles Hills Estates HOA, Michael Daily, Jeanne Yen and Frank Niesner.